***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence and legal conclusions in this matter. Having reconsidered the evidence and legal conclusions, the Full Commission reverses the Deputy Commissioner's decision and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement dated August 13, 2003 as:
 STIPULATIONS
1. The parties were subject to and bound by the N.C. Workers' Compensation Act at the time of the alleged incident on March 16, 2000.
2. An employee-employer relationship existed between the employee Melissa Harris and employer Sara Lee.
3. The named employer is self-insured.
4. The employee's average weekly wage for this claim is $476.25.
5. Plaintiff entered into an Agreement of Final Settlement and Release on April 5, 2001.
6. The parties disagreed on the extent of the issues for decision by the Commission.
Plaintiff contends that the issues before the Commission are as follows:
a. Whether plaintiff's Motion to Set Aside Agreement of Final Settlement and Release should be granted;
b. Whether plaintiff's carpal tunnel syndrome was caused by her employment with defendant-employer; and,
c. Whether plaintiff is entitled to payment of permanent partial or total disability, and medical expenses related to the alleged injury on March 16, 2000.
Defendants contend that the only issue before the Commission is whether plaintiff is entitled to have the Agreement of Final Settlement and Release set aside.
7. The parties submitted the following documents into evidence:
a. North Carolina Industrial Commission Forms from the present case;
b. Medical Records from Tarboro Clinic, Carolina Regional Orthopaedics, Heritage Hospital, Pitt County Memorial Hospital, Duke University Medical Center;
c. Mediated Settlement Agreement dated April 5, 2001; and,
d. Agreement of Final Settlement and Release dated April 5, 2001.
 ***********
Based upon the foregoing stipulations of the parties, and the competent and credible evidence of record, including all stipulated documents, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is 42 years of age, having been born September 16, 1962. She has a high school diploma but no other education or vocational training other than on-the-job training. Plaintiff was employed with defendant Sara Lee as a Machine Operator for approximately 11 years from 1989 to 2001. Her duties included working as a machine operator, loading and unloading pans of cake, and packing products into boxes.
2. Around late 1999, plaintiff experienced pain in her right wrist along with numbness and tingling in her fingers. On March 16, 2000, plaintiff was seen by Clifford Amos, physician's assistant to James Winslow, M.D., at Tarboro Clinic in Tarboro, North Carolina, complaining of right hand pain. Plaintiff was diagnosed with de Quervain's tenosynovitis of the right hand, treated with an Ace wrap and the medicine Naprelan, and placed on light duty.
3. Following the initial treatment on March 16, 2000, Mr. Amos referred plaintiff to Dr. Alberto d'Empaire, who treated her for de Quervain's tenosynovitis and carpal tunnel syndrome of the right hand. This treatment included medication, occupational rehabilitation, two carpal tunnel release surgeries to the right hand, and a release of the right de Quervain's. The first surgery was performed on June 1, 2000.
4. On November 9, 2000, plaintiff requested an impairment rating from Dr. d'Empaire with regard to her right carpal tunnel syndrome, stating to the doctor that she wanted to settle her claim prior to her surgery for de Quervain's. Dr. d'Empaire speculated that, in a case such as hers, a 10% permanent partial disability rating would usually be given. However, plaintiff did not settle her case at that time, and she ultimately underwent the second surgery on March 2, 2001.
5. Following the second surgery, plaintiff continued to treat with Dr. d'Empaire for persistent pain in her right hand. On April 4, 2001, Dr. d'Empaire responded to a "fill in the blank" letter sent by plaintiff's then attorney and assigned plaintiff a 12% permanent partial disability rating to her right hand. In the letter, Dr. d'Empaire also stated that plaintiff had not reached maximum medical improvement, and he only estimated her projected date of maximum medical improvement. He wrote that she could not work for at least six weeks, and that her condition was severe enough to render her permanently partially or permanently totally disabled. The letter sent by plaintiff's counsel to Dr. d'Empaire stated that it was important for plaintiff to have this information because she was scheduled to mediate her claim the very next day.
6. As of April 4, 2001, plaintiff was continuing to receive treatment for her right hand, and was continuing to complain of pain and numbness. On April 5, 2001, the parties conferred at a mediated settlement conference conducted by Lewis Sauls. Plaintiff was represented by Attorney Richard Cannon, and defendants were represented by Attorney Linda Stephens of Teague, Campbell, Dennis Gorham, L.L.P.
7. At mediation, the parties agreed to enter into a settlement agreement whereby all matters and things in controversy "arising out of the alleged occupational injuries" would be settled for a lump sum of $35,000, such sum to represent a settlement "of a disputed matter and not an admission of liability and to be in lieu of any disability or other worker's compensation benefits, including but not limited to change in condition, medical and death benefits, which are due or may be due plaintiff, her dependents, her estate or any other representative of plaintiff, now or at any time in the future pursuant to the North Carolina Workers' Compensation Act."
8. At the hearing before Deputy Commissioner Ledford, plaintiff testified, and the Full Commission finds as fact, that at the time of the mediation and settlement of her claim, her hand was still bothering her, she was continuing to seek medical treatment, and she was unable to work. She thought her condition would improve within a few months following the mediation, based upon statements Dr. d'Empaire made to her. She was unaware at the time of the mediation that Dr. d'Empaire had damaged her nerve. At no time during her testimony did plaintiff state that the assessment of her injury by Dr. d'Empaire affected her decision to enter into the settlement agreement.
9. Patricia Lockett, who had attended the mediation on behalf of the employer, also testified at the hearing. Ms. Lockett testified that she knew at the time of the mediation that plaintiff was continuing to have problems with her hand, and that plaintiff complained at the mediation that she "could not do anything" with her right hand. Ms. Lockett testified that she was aware that Dr. d'Empaire continued to keep plaintiff out of work, and that he did not believe she had reached maximum medical improvement at the time of the mediation. With the knowledge that plaintiff was not at maximum medical improvement, was still having problems with her hand and was unable to return to work, Ms. Lockett, representing the employer, remained willing to settle this denied claim. Plaintiff did not elicit any testimony from Ms. Lockett that she relied on any statements regarding plaintiff's recovery, or the future of plaintiff's injury whatsoever in reaching the settlement. There was also no testimony from Ms. Lockett that the assessment of plaintiff's injury by Dr. d'Empaire affected her decision to enter the settlement agreement and no testimony that she would not have entered the agreement had she been aware of the alleged injury to plaintiff's median nerve.
10. Dr. d'Empaire, in his deposition, admitted that he gave plaintiff a disability rating of twelve percent about two months early because she asked him about it, "therefore [he} was trying to be helpful and give her that ahead of time. . . ." It is obvious from the medical records, Dr. d'Empaire's testimony, and plaintiff's testimony that her medical condition was not stable and her treatment incomplete. This was the second time that plaintiff had asked for a rating in order to settle her case.
11. Plaintiff and her attorney and defendants and their attorney certified that the medical records and rehabilitation reports attached to the settlement agreement tendered to the Industrial Commission constituted full and complete medical reports as required by N.C. Gen. Stat. § 97-82, and Rule 502 of the North Carolina Industrial Commission.
12. The Order approving the settlement agreement was entered by then Special Deputy Commissioner Myra L. Griffin on June 13, 2001. After reviewing the settlement agreement, the full and complete medical records, and with full knowledge that plaintiff was then not working, Special Deputy Griffin made a finding that the agreement was fair and equitable, and in the best interest of all parties. With respect to the facts known at the time the settlement agreement was approved, the Full Commission also finds the settlement agreement to be fair and equitable, and in the best interest of all parties.
13. Following the signing of the settlement agreement, plaintiff sought further medical treatment for her complaints with her right hand at Duke University Medical Center.
14. On June 8, 2001, Dr. Lawrence Scott Levin at Duke University Medical Center saw Ms. Harris for evaluation. Dr. Levin prescribed a repeat EMG, which revealed no evidence of nerve conduction to the long finger or ring finger, a strong indication of nerve laceration. On July 6, 2001, after the settlement agreement had been approved by the Industrial Commission, plaintiff went to Duke University Hospital for nerve conduction studies. An EMG and NCV study was performed and was positive for injury to the median sensory nerve to the long and ring finger. On August 29, 2001, Dr. Levin saw Ms. Harris and conducted the following procedures: carpel tunnel release above the wrist, exploration of neuroma involving index and long finger common digital nerves, resection of neuroma, microsurgical repair of transected nerves into the palm. On August 29, 2001, plaintiff also underwent a third carpal tunnel release and nerve repair performed by Dr. Lawrence Scott Levin at Duke University Medical Center. Dr. Levin found significant nerve scar tissue caused from the digital nerves to the long and index fingers having been cut by Dr. d'Empaire at his March 2, 2001, operation, which was consistent with the immediate numbness plaintiff experienced after the second surgery.
15. Dr. Phillip Cummins provided an "Expert Witness Report", dated December 2, 2002, in which he stated: "It is my opinion that Dr. Alberto d'Empaire deviated below the standard of care while treating Ms. Melissa Harris. This deviation below the standard of care occurred during the second operation on March 2, 2001, when the median nerve was most likely lacerated. This injury to the median nerve that occurred on March 2, 2001, will cause significant disability to the patient with a permanent loss of some sensation."
16. On June 30, 2003, an Evaluation for Permanent Impairment, North Carolina Industrial Commission form was filled out and signed by Dr. Levin, noting that Ms. Harris' work-related injury resulted in the following percentage of impairment: 5% to the thumb, 48% to the index finger, 54% to the middle finger, 42% to the ring finger, and 36% to the little finger.
17. On April 11, 2003, plaintiff filed a Motion to Set Aside Agreement of Final Settlement and Release (to which defendants responded on May 8, 2003), based primarily on her position that there had been a mutual mistake of fact, i.e., that neither she nor the defendants knew that Dr. d'Empaire had severed a nerve in her hand during the March 2, 2001, operation.
18. As a result of plaintiff's carpal tunnel condition and the apparent medical malpractice, plaintiff cannot use her right hand.
19. At the time of the mediation and settlement of her claim, plaintiff's hand was still bothering her, she was continuing to seek medical treatment, and she was unable to work. The medical records also confirm that she was continuing to have pain with her right hand following the second surgery, and up through the date of mediation. However, based upon the statements of Dr. d'Empaire, plaintiff thought that her condition would improve within the two months following the mediation. At that time, plaintiff and defendants were unaware that plaintiff had further damage to her nerve, caused by Dr. d'Empaire during the March 2, 2001, surgery.
20. Plaintiff is right hand dominant and has indicated that she has lost a significant amount of function in her right hand. She testified that she has numbness in her three large fingers and has great difficulty writing. She has not returned to work for Sara Lee or for other employer.
21. The evidence of record makes it clear that at the time the compromise settlement agreement was entered, neither party, plaintiff nor defendants, was aware of the full extent of plaintiff's injury to her right hand, due to the laceration of the nerve, which apparently occurred during the second CTS release. This condition, although it existed at that time, had not been discovered. Therefore, although the parties understood that plaintiff had not yet reached maximum medical improvement, neither was aware of a significant fact regarding her physical condition, which would in fact impact the extent of her permanent disability. Nevertheless, both parties entered into the settlement agreement without reserving any rights with respect to facts then unknown.
22. The additional damage to plaintiff's median nerve, and the subsequent impairment ratings, were significant material facts, which would impact the bargaining positions of both parties, in any mediation and ultimate settlement of this case, had those facts been available prior to the mutual settlement.
23. In considering the evidence and the extent of the issues, the Full Commission particularly notes that defense counsel specifically agreed to submit the physicians' depositions in the malpractice case only on the limited issue of setting aside the compromise settlement agreement. Due to the lack of agreement by counsel, and the fact that evidence was not taken by both counsel on the underlying issue as to whether the plaintiff's carpal tunnel syndrome is an injury by accident or occupational disease related to her employment, the issue before the Full Commission is therefore limited to whether the settlement agreement should be set aside.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following additional
 CONCLUSIONS OF LAW
1. The Industrial Commission may set aside a settlement agreement pursuant to N.C. Gen. Stat. § 97-17 where it can be shown "that there has been error due to fraud, misrepresentation, undue influence or mutual mistake." N.C. Gen. Stat. § 97-17. Settlement agreements may also be set aside when the claimant is not represented by counsel and where they do not summarize the employee's age, educational level, past vocational training, past working experience, and any impairment . . . which predates the current injury. Rule 502(2)(h) of the Workers Compensation Rules of the North Carolina Industrial Commission, and Smythe vs. WaffleHouse, ___ N.C. App. ___, ___ S.E.2d ___, 2005 (WL 1147829, N.C. App.; No. COA04-225; May 17, 2005). Here, there has been no showing of fraud, misrepresentation, undue influence or mutual mistake. Also, plaintiff in the present case was represented by counsel, and therefore Rule 502(2)(h) by its terms does not apply.
2. Compromise settlement agreements and mediated settlement agreements in North Carolina workers' compensations cases are governed by general principles of contract law. Lemly v. Colvard Oil Co., 157 N.C. App. 99,103, 577 S.E.2d 712, 715 (2003). At the time the agreement was reached, plaintiff was aware both through personal knowledge and the information given to her by her physician that her injury had not completely resolved and that she was not at maximum medical improvement. In fact, the April 4, 2001, assessment of Dr. d'Empaire not only indicates that plaintiff was not at maximum medical improvement, he also notes that it was possible plaintiff could be permanently totally disabled. In spite of this cautionary medical advice, plaintiff's stated intent at the mediation was to settle the claim. The fact that a condition of which she was not aware may have existed at that time does not mean that the agreement is voidable for mutual mistake. Plaintiff made no reservation of rights with respect to unknown facts. She nevertheless took the risks inherent in such knowledge and lack of knowledge and, with the advice of her counsel, settled her claim. Robertsv. Century Contractors, Inc. ___ N.C. App. ___ 592 S.E.2d 215 (2004), cited by plaintiff, is thus not on point.
3. This case bears far less resemblance to Roberts v. CenturyContractors, supra, than it does to Mullinax v. Fieldcrest Cannon, Inc.,100 N.C. App. 248, 395 S.E.2d 160 (1990). In Mullinax, the parties entered an agreement to pay plaintiff for employment-related asbestosis, which was diagnosed by a treating physician. Subsequent to the submission of the Form 21 agreement, an Advisory Medical Committee, whose opinion is definitive under the Industrial Commission rules, found that plaintiff did not have asbestosis. Defendant moved to have the settlement agreement set aside on the grounds of mutual mistake. The Full Commission agreed and set aside the agreement, only to be overruled by the Court of Appeals. While the defendants argued that both parties to the agreement believed that plaintiff suffered from asbestosis and entered into the settlement agreement accordingly, the Court found that, although "[d]efendant may have entered into the agreement on the mistaken belief that plaintiff had compensable asbestosis, . . . that was not the motivation for plaintiff's entering into the agreement."
Here the record is devoid of any indication that defendants entered into the agreement based on the alleged "mistake" in Dr. d'Empaire's assessment of plaintiff's injury and impairment rating. In fact, the record clearly shows that defendants' motivations for entering into the agreement in this case were completely unrelated to d'Empaire's assessment or plaintiff's continuing difficulties. Defendants would naturally be motivated by a desire to settle a disputed claim without facing the full amount of exposure that they might expect from an adverse ruling by the Industrial Commission. Plaintiff's motivations were likely to be entirely different, but the record is unclear of exactly why she entered the agreement. In fact, nowhere in the record is there any evidence that plaintiff would have declined to enter the agreement had she known that her median nerve had been cut. Plaintiff produced no evidence that either party entered this agreement based on the alleged mistake of Dr. d'Empaire.
4. The greater weight of the evidence shows that unknowns existing at the time of execution and approval of the settlement agreement were contemplated by the parties and were settled by the agreement.
Among the clauses of the settlement agreement were the following:
 Whereas, on March 2, 2001, employee underwent surgical release of the de Quervain's of the right upper extremity and right carpal tunnel; and
 Whereas, on March 9, 2001, employee returned to Dr. d'Empaire for a post-surgical evaluation. Dr. d'Empaire recommended that employee continue use of her brace, but remove it at times for home exercise therapy, and to continue taking pain medications; and
 Whereas, on March 19, 2001, employee was again evaluated by Dr. d'Empaire. Employee complained of significant pain in the fingers of her right hand with numbness and tingling sensation. Dr. d'Empaire continued employee on pain medications, counseled her to continue use of the splint, and recommended further occupational therapy; and
 Whereas, on March 22, 2001, employee returned to Dr. d'Empaire for further observation. Employee had developed some swelling in the very tip of the right middle finger, but Dr. d'Empaire found no evidence of infection. Dr. d'Empaire adjusted employee's medications, and ordered further occupational therapy; and
 Whereas, on March 27, 2001, employee presented to John Morgan, M.D. at the Tarboro Clinic in Tarboro, North Carolina with swelling in the fingers on her right hand. Dr. Morgan suspected infection of unknown cause and prescribed antibiotics and pain medications; and
 Whereas, on March 28, 2001, employee presented to Dr. d'Empaire with evidence of fluid collection in the end of the fingertip of her right middle finger. Dr. d'Empaire drained the fluid, and continued employee on medications; and
 Whereas, on April 4, 2001, employee returned to Dr. d'Empaire for a follow-up to the previous drainage of her right middle finger. Dr. d'Empaire recommended that she continue the current dosage of her antibiotics, soak her finger in warm, soapy water, and continue using her splint as well as other minor therapies on her incisions; and
 Whereas, on April 4, 2001, Dr. d'Empaire assigned a 12% disability rating to employee's right hand; and
 * * * * Whereas, the parties hereto have conferred together at a mediated settlement conference conducted by Lewis Sauls, employee being represented by Richard Cannon, Attorney of Greenville, North Carolina, and employer and insurer being represented by Teague, Campbell, Dennis Gorham, L.L.P., Attorneys of Raleigh, North Carolina, and have decided that it would be in the best interests of all concerned to enter into an agreement whereby all matters and things in controversy arising out of the alleged occupational injuries would be settled with the payment to employee of Thirty Five Thousand Dollars ($35,000.00), in one lump sum, without commutation, such sum to represent a settlement of a disputed matter and not an admission of liability and to be in lieu of any disability or other workers' compensation benefits, including but not limited to change in condition, medical and death benefits, which are due or may be due employee, her dependents, her estate or any other representative of employee, now or at any time in the future pursuant to the North Carolina Workers' Compensation Act; and
(emphasis added)
 * * * * Whereas, employee represents to the Industrial Commission that by execution of this agreement, she knowingly and intentionally waives her right to further benefits under the North Carolina Workers' Compensation Act, but it is agreed that no rights other than those arising under the Act are compromised or released hereby; and (emphasis added)
 Whereas, it is further understood that the rights and remedies of employee against employer and/or insurer as a result of employee's employment and her alleged occupational disease are governed and controlled by the North Carolina Workers' Compensation Act and that all of such rights are being compromised, adjusted and forever resolved (emphasis added).
5. Possible malpractice during the course of workers compensation medical treatment is also of no avail to plaintiff even though N.C. Gen. Stat. § 97-26(h) provides:
 The employer shall not be liable in damages for malpractice by a physician or surgeon furnished by him pursuant to the provisions of this section, but the consequences of any such malpractice shall be deemed part of the injury resulting from the accident, and shall be compensated for as such.
This claim was a contested claim that was settled without admission of compensability by defendants. Therefore the doctor allegedly guilty of malpractice was not furnished by defendants and N.C. Gen. Stat. § 97-26(h) has no application.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission rules as follows:
 RULING
1. Plaintiff's Motion to set aside the Agreement of Final Settlement and Release must be, and the same is, DENIED.
2. Each party shall pay its own costs.
This 25th day of May 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER